In the Matter of the Application of WILLIAM A. THOMAS, Petitioner, for a Peremptory Order of Mandamus against S. HOWARD COHEN and Others, Constituting the Board of Elections of the City of New York, Respondents.

Supreme Court, Kings County, January 3, 1933.

*William A. Thomas*, in *pro. per.*

*Arthur J. W. Hilly, Corporation Counsel* [*Thomas W. Crowe, Assistant Corporation Counsel*, of counsel], for the respondents.

*John J. Bennett, Jr., Attorney-General* [*Henry Epstein, Solicitor General*, of counsel], *amicus curiæ*.

CUFF, J.    Petitioner objects to the manner in which the election was conducted, in that the voting machines permitted voting for the individuals aspiring to the offices of President and Vice-President of the United States, and failed to provide facilities for voting for those individuals who had been nominated for the offices of presidential electors.    Petitioner, who is an attorney, pleads his own case. It might be said in passing that at the argument he stated that it was not his object to disturb the apparent choice of the people; that he like Franklin D. Roosevelt and John N. Garner, is a member of the Democratic party, but that he desires to focus attention on a serious violation of the Federal Constitution.

In his petition he sets forth his own experience in voting at the ninth election district, second Assembly district, Kings county. Before entering the voting booth, he asked the election inspectors for the names of the persons who had been nominated for the office of presidential elector.    The question provoked great surprise. ' This request seemed to the people of the board rather ludicrous," he says.    A card was handed to him on which appeared the information he sought.    This card was labeled " Directions for Voting a Split Ticket for Presidential Electors."    It was the only list of

candidates for presidential electors that was available for voters. In the booth he was confronted by the voting machine on which the names of the candidates for the office of presidential elector did not appear but the names of those seeking to be elected President and Vice-President did appear.

Petitioner contends that it was his, as well as every other voter's, right to see on the machine the names of the candidates for presidential elector, and that the names of candidates for President and Vice-President should not have appeared. He rests this contention on section 1 of article 2 of the United States Constitution.

John J. Bennett, Jr., Attorney-General of the State, requested that he be permitted to intervene as *amicus curiæ*. The parties consented. The application is granted.

Petitioner stresses violations in the conduct of the election of section 107 of article 5 of the Election Law. This section sets out an arrangement on the ballot for the names of candidates for presidential elector. The title of the section is "Ballots for presidential electors." Its language would indicate that it has no application where voting machines are employed. Sections 290 *et seq.* of article 11 of the Election Law make full and detailed provisions for machine voting, repeating to a degree some of the provisions of section 107. That article is entitled "Presidential Electors; United States Senators; Representatives in Congress." It will be decided that it was proper to conduct the election in accordance with article 11 and not as provided in section 107 of article 5.

His other point is that the Constitution requires that the names of candidates for presidential electors appear on the machines. "We do not vote for the persons who are to serve as president and vice-president; we vote for presidential electors who choose such officials for us," is the substance of petitioner's argument. The provision bearing on the subject is section 1 of article 2 of the United States Constitution. It reads: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress," etc. (Subd. 2.)

That section, petitioner claims, guarantees to each voter the right to vote for presidential electors. To further emphasize that right he cites section 2 of article 14 of the Amendments of the United States Constitution, which in part provides: "*  *  * When the right to vote at any election for the choice of electors for President and Vice President of the United States  *  *  * is denied to any of the male inhabitants of such State, being twenty-one years of age *  *  * or in any way abridged  *  *  * the basis of representation [for members of the House of Representatives] therein shall

be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State."

Article 14 with article 13 are the Amendments which abolished slavery. They were ratified July 28, 1868. By that time all Legislatures had transferred the right to select electors to the voters. New York enacted the necessary legislation April 15, 1829. The citation does not help.

It is admitted that the names of the presidential electors were not on the voting machine and that they appeared only on the split or irregular ticket. On the printed strip on the machine was the caption " For Electors of President and Vice-President " followed by " For Electors of....................." In the blank space were the names of the nominees for President and Vice-President. The name of the political party and its emblem also appeared on the strip.

Does section 1 of article 2 of the United States Constitution give the right to voters to vote for presidential electors? It does not. It empowers the State to appoint them " in such Manner as the Legislature thereof may direct." As a matter of history, for many years after the Constitution was adopted the Legislatures made the appointments. The States early in 1800 (except South Carolina, which retained the old method until 1860) gave the voters the right of selection. Paper ballots, at first, were furnished. Among other things, the names of the presidential electors were set out in alphabetical order. In 1828 they were elected by districts, district electors choosing the electors at large. (Rev. Stat. 1829, part 1, chap. 6, tit. 6.) The Legislature had the right to make these provisions, and they were modified from time to time.

Times changed, and the paper ballot was no longer efficient or satisfactory. The Legislature, that provided the paper ballot for election of presidential electors, authorized the use of the voting machines. These legislators, direct representatives of the people of the State, knowing that voters were no longer interested in the personnel of the group of electors, and realizing that the whole block was voted for or against, depending upon the presidential candidates or as a matter of party attachment, omitted the names. It will be noted, however, that the law authorizing the voting machines does not provide for direct voting for the executives.

Petitioner claims that the people are now required to vote for offices whereas they should vote for persons. He argued strenuously and at great length that the names are vital; that voters should not have to ask for them as he was required to do; that they should be before all the voters and not only those who desire to vote the

split or irregular ticket. " I am entitled to know just who the person is and where he lives, to whom I entrust the duty of selecting for me a president and vice-president. I might have great confidence in one man and none in another of the same group. It matters not what their politics is. The presidential electors can make the selection without regard to politics or the candidates nominated by the political parties," said petitioner at the argument. In his brief he states: " The law gives the elector the absolute right to vote for any one whom he may please for president and vice-president of the United States."

Petitioner means by these utterances that the electors are not bound to vote for the candidates nominated by the political parties which they represent; that they may vote for any qualified person. Do presidential electors possess such freedom of action? Does the United States Constitution require them to vote as directed by the voters of their State? Confining yourself to the exact language of that instrument brings a negative answer to that question. We must inquire, however, if anything has happened since those constitutional provisions were written which might alter the apparent meaning. If presidential electors may name any persons for President and Vice-President, no one will deny that their names should be posted before the voters on the machines, for they would be the most important and powerful officials voted for. What has happened since section 1 of article 2 was written?

For a generation the people of this country have understood that the presidential candidate who received the plurality in a State was entitled to the electoral vote of that State. That understanding has developed because of the unfailing performance by presidential electors. We started in 1787 with the system by which uninstructed individuals (the electors) appointed by Legislatures were empowered to choose the executive for the nation. We now have, and for a long time have had, a system of popular balloting for individuals (electors) who have been designated by the political parties for the sole purpose of voting for those nominated for President and Vice-President by the national convention of their party — the real persons voted for or against by the electorate of the country on election day. How did that change come about? It evolved. In the first two elections (1789 and 1792) everybody favored George Washington, so the independence of the electors, who were appointed by the Legislatures, did not come in question. In 1796 party lines — Federalists and Republicans — appeared. Adams and Jefferson were before the country as rivals. Practically all electoral votes were cast for them. The record shows a few for others. The fourth election was a party struggle, but, when the popular votes were cast,

the battle ended. The result was announced and accepted. Subsequently the electors met and cast their votes exactly as the popular vote directed. Thereafter, in order to center on one man, the members of Congress of each party agreed upon the person the electors should vote for, if successful. Regularly the electors followed the will of the voters, without even ordinary notice. About eighty-five years ago, the national convention idea came into being, and since then the aspirants have been named by the political parties.

Since then every four years the people participated, or interested themselves, in these nominations. Prior to the election the nominees and thousands of spokesmen in their behalf, by the written and spoken word, declared themselves on questions of interest to the people and importance to the country. The widest publicity was given to these pronouncements. The nominees submitted their qualifications to the people for examination. Their names were heralded throughout the land. Laws were enacted by the States, and expensive primary elections held, to bring about these nominations. Vast sums were expended, subject to restriction by legislation, during the campaign to promote the candidacies of the nominees.

That the people gave attention to what went on is evidenced by the throngs that attended the mass meetings; by their reading the comments and reports contained in the publications and private discussions of the merits and claims of the nominees. As years went on the nominating convention attracted greater attention, until to-day it is regarded as an American institution, although not countenanced by any Federal law. Methods of spreading publicity have been improved. Now millions are spent by each of the major political parties every four years, in that department alone. The radio carries the voices of the nominees over the entire country. Every interested person can hear for himself what the nominees stand for.

On election day the people vote, not for electors (it is safe to say that no voter could name those he voted for), but for the nominees for President and Vice-President. Presidential elections are required to be held on the same day throughout the Union.

Election night in the United States is devoted by the public, generally, to learning the result of the vote which has been cast that day by the citizens of the nation. Before they retire for the night, or at least by the next day (in one instance it was three days later) the American public — in fact the world — knows who was chosen President and Vice-President. The expressions " elected " and " defeated " mentioning the nominees are freely used by the

people and the press in their comments on, and reports of, the results of the voting. No one has ever questioned the accuracy of that form of expression. No one has ever suggested that the choice was not made on election day. No one has ever ventured the thought that the announcement of the victors should await the meeting of the presidential electors.

In the 1932 election about 40,000,000 participated. Those 40,000,000, and all others with sufficient understanding of the remaining 80,000,000 inhabitants, knew on November ninth last who were elected President and Vice-President of the United States. Those 40,000,000 voters and all others have proceeded with their affairs — business, political, and social — upon the assumption that the election is over. The present incumbent has conferred with his successor as to the foreign debt situation, and foreign governments took cognizance in November of the final character of the vote of the people on November eighth. Nothing in all of the years has happened to question or shake the reliance that all have placed upon the balloting on an election day as a determination of who will serve as President and Vice-President.

It is true many are informed of the procedure that only the presidential electors are chosen on election day. They know, too, that these electors are scheduled to meet and vote for a person for President and another for Vice-President; that technically no one is chosen until that formality has been complied with. But they know, too, that electors have always chosen the nominees of the national convention of their party, and those informed folks assume they will do as they have always done and pay no further attention to the matter.

The practice of electors voting for the presidential candidates of their party boasts of an unbroken record of fulfillment. (One exception in the case of one elector is reported.) The American people have grown to regard the electoral college as a matter of minor importance. Very few know exactly when and where the meeting takes place, and a great many have no knowledge of the gathering at all. The electors are expected to choose the nominee of the party they represent, and no one else. So sacred and compelling is that obligation upon them, so long has its observance been recognized by faithful performance, so unexpected and destructive of order in our land would be its violation, that the trust that was originally conferred upon the electors by the people, to express their will by the selections they make, has, over these many years, ripened into a bounden duty — as binding upon them as if it were written into the organic law. The elector who attempted to dis-

regard that duty could, in my opinion, be required by mandamus to carry out the mandate of the voters of his State.

The services performed by the presidential electors to-day are purely ministerial, notwithstanding the language of the Constitution written over 100 years ago. To read that document with an eye to the language only and with a disregard for the brilliant history of party government in this nation, which has been attended with such signal success (placing us first among the nations of the world), would mean to hold that our primaries, nominating, campaigning, and voting, are empty gestures.

" They [electors] are now so little significant that to enable the voter to know for which set of electors his party desires him to vote, it is found necessary to put the name of the presidential candidate whose interest they represent at the top of the voting ticket on which their own names are printed." (The American Commonwealth, by James Bryce, p. 38.)

To allow them to set at naught the popular election would be to invite a second campaign to be held between election day in November and the day that the electors meet in January. No one ever embarked upon such a campaign, that history records, because all recognize that the die is cast when the votes of the people are counted. The American public understands that the electoral vote is sealed when the results in the States are known, and that the meeting of the electors is for the purpose of formally casting that vote for the presidential nominees who won the States.

" These conventions [national political] are not recognized by the Constitution, nor have their nominations any legally binding force. But the electors, subsequently nominated and elected for the sole purpose of giving the vote of the State to a certain party candidate, are as securely bound to that course of action by custom and honor as they would be by statute. The people, consequently, elect the President and Vice-President by States, and the College is a cumbrous machine for formally conveying to Washington the wishes of the majority. Since 1801, with one exception (the disputed election of President Hayes in 1877), the vote of an elector has been known with certainty several weeks before it is cast and several months before it is officially announced." (The New International Encyclopædia [2d ed.], vol. 7, p. 576.)

The evolution narrated was natural. The reason for the electoral college ceased long ago. No matter what language was used in the debates of the Constitutional Convention, and some of it was unmistakable, the underlying thought was, that those statesmen who met in Philadelphia distrusted the judgment of the ordinary voter. It is apparent that they thought that the governing class

— and there was a governing class of those days — was better qualified to make the selection than the voters. Observe the following minutes of July 25, 1787, as reported by James Madison in his " Debates in the Federal Convention of 1787 " (Revision of 1863, Jonathan Elliot, vol. 5, p. 368):

" Col. Mason. In every Stage of the Question relative to the Executive, the difficulty of the subject and the diversity of the opinions concerning it have appeared; nor have any of the modes of constituting that department been satisfactory.

" First, it has been proposed that the election should be made by the people at large; that is, that an act which ought to be performed by those who know most of Eminent characters, & qualifications should be performed by those who know least; secondly, that the election should be made by the Legislatures of the States; thirdly, by the Executives of the States. Against these modes also, strong objections have been urged. Fourthly, it has been proposed that the election should be made by Electors chosen by the people for that purpose. This was at first agreed to; but on further consideration has been rejected. Fifthly, since which, the mode of Mr. Williamson, requiring each freeholder to vote for several candidates has been proposed. This seemed, like many other propositions, to carry a plausible face, but on closer inspection is liable to fatal objections. A popular election in any form, as Mr. Gerry has observed, would throw the appointment into the hands of the Cincinnati, a Society for the members of which he had a great respect, but which he never wished to have a preponderating influence in the Govt. Sixthly, another expedient was proposed by Mr. Dickinson, which is liable to so palpable and material an inconvenience, that he had little doubt of its being by this time rejected by himself. It would exclude every man who happened not to be popular within his own State; though the causes of his local unpopularity might be of such a nature as to recommend him to the State at large. Seventhly, among other expedients, a lottery has been introduced. But as the tickets do not appear to be in much demand, it will probably not be carried on, and nothing therefore need be said on that subject. After reviewing all these various modes, he was led to conclude, that an election by the National Legislature as originally proposed, was the best. If it was liable to objections, it was liable to fewer than any other. He conceived, at the same time that a second election ought to be absolutely prohibited. Having for his primary object — for the polar star of his political conduct — the preservation of the rights of the people, he held it as an essential point, as the very palladium of Civil liberty, that the great officers of State, and par-

ticularly the Executive should at fixed periods return to that mass from which they were first taken, in order that they may feel and respect those rights and interests which are again to be personally valuable to them. He concluded with moving that the constitution of the Executive, as reported by the Committee of the whole be re-instated, viz. ' That the Executive be appointed for seven years, & be ineligible a 2d. time.'

" Mr. Davie seconded the motion.

" Dr. Franklin. It seems to have been imagined by some, that the returning to the mass of the people was degrading the magistrate. This, he thought was contrary to republican principles. In free Governments, the rulers are the servants, and the people their superiors and sovereigns. For the former, therefore, to return among the latter, was not to degrade, but to promote, them. And it would be imposing an unreasonable burden on them, to keep them always in a State of servitude, and not allow them to become again one of the Masters."

It is easy to understand why these patriotic citizens talked as they did at that convention. They were the supporters of the government. They backed it. They knew the pitfalls. They were familiar with its history — its mistakes, its successes. It was they who dared to sign the Declaration of Independence. Do we realize that failure of the Rebellion would have translated the famous Declaration into a death warrant of those whose signatures were affixed to it? It was they who fought and won the Rebellion. Did not George Washington preside over the convention? They were forming this great government alone, and to some extent without even ordinary support or interest on the part of the general public. They were aware of and felt the indifference of the people in government building. In view of all of those circumstances, many of the delegates considered that they had a proprietary interest in the new republic; that they actually owned the United States. Considering their service and the attitude of the public in those days, perhaps they were justified in looking upon the situation in that way. But, irrespective of their right to do so, they so regarded it, and the Constitution was born of such an assemblage.

There were, of course, others in the convention who entertained a wholly different point of view. They had confidence in the people. They were few and ineffective. A compromise between the group favoring selection by the National Legislature and the group that urged a choice by the State Legislatures was ultimately reached. Those who favored the direct vote were not considered. The compromise adopted was the system of electors appointed by the State Legislatures.

It is apparent that all the reasons for indirect voting for our national executive have vanished. The Legislatures of the States have given up their right of appointment and passed the power of choosing of electors to the voters over 100 years ago. The conditions that obtained then changed radically long ago. There is no ruling class. No one has even the slightest excuse to think that he owns the government or the country to-day. It is not supported or backed by any individual or group of individuals. No small number, as in 1776, were under arms during the last war. Four million Americans participated. Each of the 120,000,000 inhabitants contributes his share to the support of this government. Every man, woman and child claims equal rights with every other person. Every citizen over twenty-one years of age, except idiots and felons, may vote, and true expression of opinion is now obtainable for the whole country. This evolution has placed the power unmistakably in the hands of the voter to select the executive officers of this country. In my opinion that apparent right of freedom and choice which was incorporated in the Constitution was lost to the presidential electors long ago because of these changes.

Section 1 of article 2 would not have been written if present-day conditions existed or if a majority of those present could have foreseen even to a slight degree what has happened. Could they have visualized the national convention, direct voting would have received consideration.

Free people have the right to effect a change in the meaning of their written constitution by the process of long and continuous interpretation followed by action, which interpretation and action are contrary to the exact wording of the organic law. Marked change in conditions, non-existence of reasons for provisions, official action coupled with universal public acceptance and co-operation repeated over a long period of time, such as 100 years, warrant giving to words a meaning interpretive of those new conditions and actions, when the new meaning accords fully and completely with the understanding that the public has had for a long time. That is especially so, when a strict interpretation of the language is fraught with unnecessary dangers that would, without doubt, menace the peace and well being of the nation and might even rise to proportions that would challenge the very existence of the republic.

There has always been authority for that principle. Only recently it was reiterated by the United States Supreme Court. The case was the attempted reapportionment of congressional districts by legislative resolution. Theretofore reapportionment had been accomplished by law. The language of the United States

Constitution (Art. 1, § 4) to be interpreted was: " The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

Although " by the Legislature " is the expression in the first sentence and " by Law " follows in the next, the court held that " by the Legislature " should be interpreted to mean " by Law." One of the reasons given was that it had been so understood as evidenced by the official action of the State. In the opinion written by Chief Justice HUGHES (*Smiley* v. *Holm*, 285 U. S. 355, 369; 52 S. Ct. 397, 400; 76 L. Ed. 795) we find: " The practical construction of article 1, § 4, is impressive. General acquiescence cannot justify departure from the law, but long and continuous interpretation in the course of official action under the law may aid in removing doubts as to its meaning. This is especially true in the case of constitutional provisions governing the exercise of political rights and hence subject to constant and careful scrutiny. Certainly, the terms of the constitutional provision furnish no such clear and definite support for a contrary construction as to justify disregard of the established practice in the States. (*McPherson* v. *Blacker*, 146 U. S. 1, 36; *Missouri Pacific Railway Co.* v. *Kansas*, 248 U. S. 276, 284; *Myers* v. *United States*, 272 U. S. 52, 119, 136; *The Pocket Veto Case*, 279 U. S. 655, 688–690.) "

I cannot subscribe to the doctrine advanced by petitioner that presidential electors have a right to defy the will of the people and to " vote as they please, even for a candidate whose electors were rejected at the polls." Their importance has been greatly reduced; their " choosing " is a mere formality now. They must vote in accordance with the vote of the people. The author of the New International Encyclopædia (*supra*) considers that usage and understanding have amended the constitutional provision as to electors to make it conform to practice. He says (at p. 575): " The present position and functions of the electoral college furnish a striking illustration of the way in which a written and stable constitution may be undermined and amended by the silent process of customary observance."

There is no necessity for a voting machine to be incumbered with their names. The constitutional provision is complied with if the names are available as section 260 of the Election Law provides.

It would seem that presidential electors would have a real service to perform in the event that the nominees for President and Vice-President, who won the majority of the electors at the polls, died before assuming their offices. Perhaps legislation is needed to

meet the contingency that would arise if the two deaths occurred after the meeting of the electoral college and before the time of taking office of the President elect and Vice-President elect.

Petitioner's principal arguments for listing the names of presidential electors on the voting machines have been disposed of. His last contention, that the secrecy clause of the New York Constitution (Art. 2, §. 5) was violated because he was required to ask for a list of candidates for elector, thus revealing his intention to split his vote, has been urged before in applications attacking the use of voting machines and the courts have uniformly rejected the claim. (*Matter of Gerling* v. *Nichols*, 123 Misc. 811.)

The application for the writ of mandamus is denied.