
FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAY 2 3 2019
for CHIEF JUSTICE

This opinion was
filed for record
at 8am on 5-23-2019
Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of ) | No. 95347-3 |
| ) | |
| LEVI GUERRA, ESTHER V. JOHN, and ) | En Banc |
| PETER B. CHIAFALO, ) | |
| ) | |
| Appellants. ) | Filed   MAY 2 3 2019 |

MADSEN, J.—Appellants Levi Guerra, Esther John, and Peter Chiafalo moved for direct appeal of a Thurston County Superior Court decision upholding the imposition of a $1,000 fine for failing to cast their votes in the United States Electoral College in accordance with the popular vote in the State of Washington. They argue the fine is a violation of article II, section 1 of the United States Constitution, the Twelfth Amendment, and the First Amendment.

For the reasons below, we reject appellants' argument and affirm the trial court.

No. 95347-3

FACTS

Background Facts

Under Washington State election law RCW 29A.56.320, each political party with presidential candidates is required to nominate electors from its party equal to the number of senators and representatives allotted to the state. People nominated are required to pledge to vote for the candidate of their party.[1,2] Should nominees choose not to vote for their party candidate, they may be subject to a civil penalty of up to $1,000. *See* RCW 29A.56.340. The people of the state do not vote for presidential electors. Rather, they vote for presidential candidates. The nominees of the party that wins the popular vote are appointed by the legislature to be Washington State's presidential electors. Along with all but two other states, Washington has a "winner-take-all" electoral system.

---

[1] RCW 29A.56.320 covers how electors are nominated. It reads:
> In the year in which a presidential election is held, each major political party and each minor political party or independent candidate convention that nominates candidates for president and vice president of the United States shall nominate presidential electors for this state. The party or convention shall file with the secretary of state a certificate signed by the presiding officer of the convention at which the presidential electors were chosen, listing the names and addresses of the presidential electors. Each presidential elector shall execute and file with the secretary of state a pledge that, as an elector, he or she will vote for the candidates nominated by that party. The names of presidential electors shall not appear on the ballots. The votes cast for candidates for president and vice president of each political party shall be counted for the candidates for presidential electors of that political party; however, if the interstate compact entitled the "agreement among the states to elect the president by national popular vote," as set forth in RCW 29A.56.300, governs the appointment of the presidential electors for a presidential election as provided in clause 9 of Article III of that compact, then the final appointment of presidential electors for that presidential election shall be in accordance with that compact.

[2] Appellants do not challenge the requirement that electors pledge to vote for the candidates who win the popular vote.

2

Appellants were nominated as presidential electors for the Washington State Democratic Party ahead of the 2016 presidential election. Hillary Clinton and Tim Kaine won the popular vote in Washington State, meaning appellants and their fellow Democratic Party nominees were appointed by the legislature to serve as electors for the State of Washington.

Based on the results from the nationwide election, it was expected that Donald Trump would become the next president. Nationwide, some electors, including appellants, announced they would not vote for either Clinton or Trump and would instead attempt to prevent Trump from receiving the minimum number of Electoral College votes required to become president.[3] Under the Constitution, if no candidate receives a majority of the Electoral College votes, the House of Representatives is to determine who will be the next president.

On December 19, 2016, appellants, along with the other presidential electors, met in Olympia to cast their ballots. Appellants did not vote for Hillary Clinton and Tim Kaine, as required by their pledge, but instead voted for Colin Powell for president and a different individual for vice-president. These votes were counted and transmitted to Congress for the official tally of the electoral votes. On December 29, 2016, the

---

[3] During the 2016 election, seven presidential electors across the country voted for someone other than their pledged candidate. Four of these "faithless electors" were a part of Washington State's contingency to the Electoral College. *See* Kiersten Schmidt & Wilson Andrews, *A Historic Number of Electors Defected, and Most Were Supposed to Vote for Clinton*, N.Y. TIMES (Dec. 19, 2016), https://www.nytimes.com/interactive/2016/12/19/us/elections/electoral-college-results.html.

3

Washington secretary of state fined appellants $1,000 each, under RCW 29A.56.340, for failing to vote for the nominee of their party.[4]

Procedural Facts

Appellants appealed their fines to an administrative law judge (ALJ), arguing the fines were unconstitutional. Having no authority to rule on constitutional matters, the ALJ upheld the imposition of the fine, and appellants appealed to the Thurston County Superior Court.

The appeal was heard before Judge Carol Murphy of the Thurston County Superior Court. In affirming the secretary of state, the trial court noted the fine was constitutionally permissible because "[t]he State is not adding a qualification, nor is the State here requiring specific performance of the pledge." Verbatim Report of Proceedings at 49. Appellants timely filed a notice of appeal and filed a motion for direct review in this court.

---

[4] RCW 29A.56.340 outlines the procedure for casting electoral votes and the penalty for failing to vote for the nominee of the elector's party. It reads:

> The electors of the president and vice president shall convene at the seat of government on the day fixed by federal statute, at the hour of twelve o'clock noon of that day. If there is any vacancy in the office of an elector occasioned by death, refusal to act, neglect to attend, or otherwise, the electors present shall immediately proceed to fill it by voice vote, and plurality of votes. When all of the electors have appeared and the vacancies have been filled they shall constitute the college of electors of the state of Washington, and shall proceed to perform the duties required of them by the Constitution and laws of the United States. *Any elector who votes for a person or persons not nominated by the party of which he or she is an elector is subject to a civil penalty of up to one thousand dollars.*

(Emphasis added.)

## ANALYSIS

### State Authority under the Constitution

Appellants claim that as presidential electors, they perform a federal function. Further, they contend that electors are intended to exercise independent judgment in casting their ballots and that imposition of a fine by state law for failing to vote in a particular way interferes with a federal function in violation of the Constitution.

Electors rely heavily on the origins of the Electoral College, so we begin there. When the Electoral College was first created, there were a number of competing proposals for selecting the executive. Some delegates to the Constitutional Convention of 1787 proposed that the national legislature should select the president. *See* Matthew J. Festa, *The Origins and Constitutionality of State Unit Voting in the Electoral College*, 54 VAND. L. REV. 2099, 2109-10 (2001). Initially, this proposal generally enjoyed agreement. *Id.* at 2109. However, some feared that entrusting selection of the executive to the legislative branch would compromise the independence of the executive branch. *Id.* at 2110. As an alternative, one delegate suggested that the president be appointed by the people. *Id.* He also suggested a system that divided the states into districts with an elector being appointed in each district who would then elect the president.

As the debates continued, the two significant, competing proposals were direct popular election and appointment of the executive by Congress. *Id.* at 2112-13. The idea of a national vote gained support among the delegates due to strong concerns about the legislative branch appointing the executive. *Id.* at 2113. James Madison advocated for the national vote, but delegates from the small states objected, seeing it as

5

disadvantageous for their states. *Id.* at 2114. When the delegates appeared deadlocked, a committee with one representative from each state was tasked with finding a reasonable solution. *Id.* at 2115. Ultimately, the committee returned with a proposal similar to today's Electoral College system—the president would be selected by a number of electors, based on the number of members of Congress each state was entitled to, who would be appointed by their respective states in such manner as they see fit. *Id.* at 2116. The system was later revised so that in the event of a runoff election, the president would be selected by the House of Representatives and the vice-president would be elected by the Senate. *Id.* at 2119.

When gathering support for ratification of the Constitution, Alexander Hamilton later wrote about the system agreed to in the convention and how it operated. *See* THE FEDERALIST NO. 68 (Alexander Hamilton). Hamilton noted the importance of having the president elected by "men most capable of analyzing the qualities adapted to the station." *Id.* "A small number of persons, selected by their fellow-citizens from the general mass, will be most likely to possess the information and discernment requisite to so complicated an investigation." *Id.* He opined that selecting several electors to nominate the president would be more prudent than having just one elector nominating the president. Similarly, having the electors vote secretly by ballot and within their respective states would serve to obstruct "cabal, intrigue, and corruption" from entering the electoral process. *Id.*

The Electoral College system was adopted in article II, section 1 of the Constitution and limits the number of electors from each state to the number of senators and representatives allocated to the state. U.S. CONST. art. II, § 1, cl. 2. Additionally, no

6

senator, representative, or persons holding federal offices of trust or profit could be selected as electors. *Id.*

The manner of appointment of electors was left to the states. In the first presidential election, the majority of states decided their respective state legislatures would appoint electors to the Electoral College. *See* Jerry H. Goldfeder, *Election Law and the Presidency: An Introduction and Overview*, 85 FORDHAM L. REV. 965, 968 (2016). Now, every state nominates electors through the popular vote. *See id.* Every state except for Maine and Nebraska employs a winner-take-all method of allocating elector votes. *Id.*

The initial Electoral College system was not without its flaws. The greatest problem was that the Constitution did not require electors to vote for a president and vice-president separately. This oversight manifested in the presidential election of 1800. John Adams picked Charles Pinckney as his running mate, while Jefferson chose Aaron Burr. *Id.* at 975. Jefferson and Burr both received 73 electoral votes even though Burr was running for vice-president. *Id.* As a result of the tie, the presidential election was sent to the House of Representatives. *Id.* To prevent a recurrence of the problem, the Twelfth Amendment was passed, requiring electors to cast one vote for the president and one vote for vice-president. U.S. CONST. amend. XII.

Historically, the Electoral College has been largely a formality, as generally the electors would cast their votes consistent with the popular vote of their respective state. *See* Norman R. Williams, *Reforming the Electoral College: Federalism, Majoritarianism, and the Perils of Subconstitutional Change*, 100 GEO. L.J. 173, 182

7

(2011). Indeed, even at the outset, "presidential electors were understood to be instruments for expressing the will of those who selected them, not independent agents authorized to exercise their own judgment." Keith E. Whittington, *Originalism, Constitutional Construction, and the Problem of Faithless Electors*, 59 ARIZ. L. REV. 903, 911 (2017). However, there have been instances where an elector voted for another candidate. Williams, *supra*, at 182. Today most states require some form of pledge by electors to vote for a particular party's candidate, and a number of states also have adopted ramifications should an elector vote contrary to that pledge. *Id.* at 182 & n.36. Neither article II, section 1, nor the Twelfth Amendment addresses electors' discretion in casting their votes.[5]

---

[5] Article II, section 1 of the Constitution reads, in part:

> Each state shall appoint, in such manner as the legislature thereof may direct, a number of electors, equal to the whole number of senators and representatives to which the state may be entitled in the congress: but no senator or representative, or person holding an office of trust or profit under the United States, shall be appointed an elector.

The Twelfth Amendment reads:

> The electors shall meet in their respective states and vote by ballot for president and vice president, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as president, and in distinct ballots the person voted for as vice president, and they shall make distinct lists of all persons voted for as president, and of all persons voted for as vice president, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the president of the senate; the president of the senate shall, in the presence of the senate and house of representatives, open all the certificates and the votes shall then be counted; the person having the greatest number of votes for president, shall be the president, if such number be a majority of the whole number of electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as president, the house of representatives shall choose immediately, by ballot, the president. But in choosing the president, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of

Against this backdrop, appellants first argue that because the Court in *Burroughs v. United States*, 290 U.S. 534, 54 S. Ct. 287, 78 L. Ed. 484 (1934), held the electors in the Electoral College perform a federal function when casting their ballots, *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579 (1819), precludes the State from imposing a fine because it unconstitutionally interferes with a federal function. Br. of Appellants at 9.

*Burroughs* is one of the earliest cases where the Supreme Court has held presidential electors perform a federal function when casting their votes in the Electoral College. In *Burroughs*, the petitioners were charged with multiple counts of violating the Federal Corrupt Practices Act, 2 U.S.C. §§ 241-256. The act was the first comprehensive campaign reform statute and required that federal candidates disclose financial information. *Burroughs*, 290 U.S. at 540-42. The petitioners challenged the indictment, arguing in part that the act contravened article II, section 1 of the Constitution. *Id.* at 542.

While the court noted, "[P]residential electors are not officers or agents of the federal government, they exercise federal functions under, and discharge duties in virtue

---

the states, and a majority of all the states shall be necessary to a choice. And if the house of representatives shall not choose a president whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the vice president shall act as president, as in the case of the death or other constitutional disability of the president. The person having the greatest number of votes as vice president, shall be the vice president, if such number be a majority of the whole number of electors appointed, and if no person have a majority, then from the two highest numbers on the list, the senate shall choose the vice president; a quorum for the purpose shall consist of two-thirds of the whole number of senators, and a majority of the whole number shall be necessary to a choice. But no person constitutionally ineligible to the office of president shall be eligible to that of vice president of the United States.

of authority conferred by, the Constitution of the United States," the Court determined that Congress enacted the Federal Corrupt Practices Act to "preserve the purity of presidential and vice presidential elections." *Id.* at 545 (citation omitted), 544. It did not "interfere with the power of a state to appoint electors or the manner in which their appointment" was made and was enacted only to address "political committees organized for the purpose of influencing elections in two or more states." *Id.* at 544. The statute "in no sense invades any exclusive state power." *Id.* at 545.

In *McCulloch*, Congress passed an act to incorporate a national bank. Maryland subsequently passed a law that imposed a tax on all banks in the state. *See* 17 U.S. at 425. When the tax was challenged, the State argued that Congress did not have the authority to create a national bank, and the states have the authority to tax such an institution. *Id.* at 400. The Court engaged in a lengthy discussion of whether Congress had the authority to create a national bank. Congress, the Court held, has the power to "lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies." *Id.* at 407. Although not expressly enumerated in the Constitution, the Court held the necessary and proper clause allowed Congress to pursue means that are necessary to the advancement of its enumerated powers. *Id.* at 418-20. Thus, the Court held the incorporation of the national bank was constitutional. *Id.* at 423-24.

The national government, in being given the power to create the national bank, also impliedly wielded the "power to preserve" said creation. *Id.* at 426. Therefore, a "power to destroy, if wielded by a different hand, is hostile to, and incompatible with these

10

powers to create and to preserve." *Id.* The Maryland tax on banks at issue, the Court held, is a power that "may be exercised so as to destroy [the bank]." *Id.* at 427. Although states have a right to tax the people and their property, "[t]he sovereignty of a state extends to everything which exists by its own authority, or is introduced by its permission." *Id.* at 429. The power to create a national bank however, was "not given by the people of a single state" but, rather, "given by the people of the United States." *Id.* "[A] single state cannot confer a sovereignty which will extend over them." *Id.* Maryland, therefore, could not tax the national bank, as it interfered with a federal function.

Appellants cite a number of examples of state actions that courts have held interfere with a federal function. In *Goodyear Atomic Corp. v. Miller*, the issue was whether a state could subject a federal nuclear production facility operated by a private entity to a workers' compensation provision for violating a state safety regulation. 486 U.S. 174, 178, 108 S. Ct. 1704, 100 L. Ed. 2d 158 (1988). The complainant in that case was injured while performing routine maintenance work at the plant. *Id.* at 176. He was awarded $9,000 in workers' compensation. *Id.* The complainant then filed for an additional award under state law, which provides additional compensation when an employer fails to comply with the state's safety requirements. *Id.*

The Court stated that "federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation." *Id.* at 180 (quoting *Envtl. Prot. Agency v. State Water Res. Control Bd.*, 426 U.S. 200, 211, 96 S. Ct. 2022, 48 L. Ed. 2d 578 (1976)). However,

11

the Court dismissed the issue of whether a supplemental workers' compensation award is a direct regulation by the states because "[the relevant federal statute] provides the requisite clear congressional authorization for the application of the provision to workers at the Portsmouth facility." *Id.* at 182. Thus, the Court held that the private contractor could be subject to a supplemental workers' compensation award under state law. Appellants here rely on this case for the principle that a state may not "dictate the manner in which the federal function is carried out." *Id.* at 181 n.3.

Similarly, courts have struck down actions taken under state constitutional provisions when they unconstitutionally interfere with federal functions. In *Hawke v. Smith*, the issue was whether the people of a state could use popular referendum to veto the state legislature's ratification of the Eighteenth Amendment. 253 U.S. 221, 224-25, 40 S. Ct. 495, 64 L. Ed. 871 (1920). In the state's constitution, any proposed amendment to the Constitution ratified by the General Assembly was also subject to a referendum by the people. *Id.* at 225. The Court held that "[t]he determination of the method of ratification is the exercise of a national power specifically granted by the Constitution; that power is conferred upon Congress, and is limited to two methods, by action of the legislatures of three-fourths of the States, or conventions in a like number of States." *Id.* at 227. "[T]he power to ratify a proposed amendment to the Federal Constitution has its source in the Federal Constitution." *Id.* at 230. If the Constitution wished direct action by the people, it would have been explicit in doing so. *See id.* at 228 (citing U.S. CONST. art. I, § 2).

12

In *Leser v. Garnett*, the State of Maryland challenged the validity of the Nineteenth Amendment. 258 U.S. 130, 136, 42 S. Ct. 217, 66 L. Ed. 505 (1922). The State had refused to ratify the proposed amendment. *Id.* The plaintiffs argued that several states have state constitutional provisions that render their legislatures' ratifications invalid.[6] *Id.* at 136-37. As stated in *Hawke*, the *Leser* Court held that "the function of a state legislature in ratifying a proposed amendment to the Federal Constitution, like the function of Congress in proposing the amendment, is a federal function . . . and it transcends any limitations sought to be imposed by the people of a State." *Id.* at 137.

Finally, appellants argue this court has also recognized the federal function principle. In *Department of Labor & Industries v. Dirt & Aggregate, Inc.*, this court held that state law cannot subject a federal subcontractor in a national park to its regulations. 120 Wn.2d 49, 52-53, 837 P.2d 1018 (1992). The department in that case sought to enforce provisions of the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, in the boundaries of a national park. The appellees in that case had constructed a road within the park, and the department conducted noise and air testing at the site solely under the authority of WISHA. 120 Wn.2d at 50. A Washington State statute had ceded "'[e]xclusive jurisdiction . . . to the United States over and within all the territory . . . set aside for the purposes of a national park.'" *Id.* at 52 (quoting RCW 37.08.200 (formerly Rem. Rev. Stat. § 8110)). Because exclusive

---

[6] It is unclear what specific state constitutional provisions were alleged to invalidate legislatures' ratification of the Nineteenth Amendment.

13

jurisdiction now lay in Congress, we reasoned that "state regulation of activities within the federal enclave may resume only with the express permission of Congress." *Id.* at 53. Although the department argued the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678, and a WISHA operational status agreement with the secretary of labor granted it authority, we disagreed, holding that nothing in the language "constitute[s] a specific and unambiguous grant of authority." *Id.* at 54. Based on the above line of cases, appellants argue the imposition of the fine in this case constitutes state interference of a federal function and should be struck down.

The State does not dispute that presidential electors perform a federal function when casting a vote in the Electoral College. *See* Br. of Resp't at 12-13. Instead, the State argues that article II, section 1 of the Constitution grants to state legislatures' plenary power to appoint electors and determine the manner in which their appointment shall be made, and the fine falls within that broad grant of authority. *Id.* at 8. The State argues that *Ray v. Blair*, 343 U.S. 214, 72 S. Ct. 654, 96 L. Ed. 894 (1952), *McPherson v. Blacker*, 146 U.S. 1, 35, 13 S. Ct. 3, 36 L. Ed. 869 (1892), and *Burroughs* support its position.

The issue in *Ray*, 343 U.S. at 217-18, was whether a state statute requiring electors to pledge their votes to a specific party candidate was unconstitutional. The Supreme Court of Alabama struck the provision down, holding that the pledge was in violation of article II, section 1 and the Twelfth Amendment to the Constitution. *Id.* at 223. The Court disagreed, holding that nothing in the Constitution prohibits an elector from "announcing his choice beforehand, pledging himself." *Id.* at 228. The Court went on to

14

note, "History teaches that the electors were expected to support the party nominees. Experts in the history of government recognize the long-standing practice." *Id.* at 228-29 (footnote omitted); *see also id.* at 228-29 nn.15-16. Indeed, the Court held that while presidential electors exercise a federal function, "they are not federal officers or agents any more than the state elector who votes for congressmen. They act by authority of the state that in turn receives its authority from the Federal Constitution." *Id.* at 224-25. *Ray* supports the State's position that nothing in the plain language of either constitutional provision prohibits a state from imposing certain conditions on electors as a part of the state's appointment powers, including requiring electors to pledge their votes.

In *McPherson*, the Court recognized that "the appointment and mode of appointment of electors belong exclusively to the States under the Constitution of the United States." 146 U.S. at 35. In that case, at issue was whether Michigan's legislature could require that presidential electors be nominated by congressional district rather than by popular vote. *Id.* at 24-25. The Court upheld the legislation stating:

> If the legislature possesses plenary authority to direct the manner of appointment, and might itself exercise the appointing power by joint ballot or concurrence of the two houses, or according to such mode as designated, it is difficult to perceive why, if the legislature prescribes as a method of appointment choice by vote, it must necessarily be by general ticket, and not by districts.

*Id.* at 25. The Court noted that the State "acts individually through its electoral college [and] by reason of the power of its legislature over the manner of appointment, the vote of its electors may be divided." *Id.* at 27. The Constitution does not provide how electors

15

shall be appointed, leaving it exclusively to the legislature to define the method of appointment. *Id.*

Also relying on *Burroughs*, the State argues that although the electors perform a federal function, that Court also noted that the State has exclusive power in appointing electors and the manner in which their appointment shall be made. *See* 290 U.S. at 544-45. As discussed in *Burroughs*, the only power left to Congress is "'the time of choosing the electors, and the day on which they shall give their votes.'" *Id.* at 544 (quoting U.S. CONST. art. II, § 1). Moreover, in *In re Green*, the Court stated the "electors for President and Vice President in each State are appointed by the State in such manner as its legislature may direct." 134 U.S. 377, 379, 10 S. Ct. 586, 33 L. Ed. 951 (1890). "The sole function of the presidential electors is to cast, certify and transmit the *vote of the State* for President and Vice President of the nation." *Id.* (emphasis added).

The State has the better argument. In each case cited by appellants, the authority that purportedly interfered with the federal function lay not in the states, but rather in Congress. Thus, the threshold issue was whether the State had been given authority to engage in activity that was specifically conferred to the federal government. For example, in *McCulloch*, the issue was whether a state had the authority to tax a national bank. The Court essentially held that states were not granted the authority to regulate national corporations. A national corporation is a creation unique to the federal government under the necessary and proper clause to carry out one of Congress's enumerated powers. The Constitution does not confer any authority on the states to interfere or control that manner.

16

Similarly, in *Hawke* and *Leser*, the Court reasoned that the Constitution does not grant to the people of the states the authority to interfere with the ratification of constitutional amendments. Instead, that power was specifically conferred to the legislatures of the states to ratify. That same reasoning was followed by this court in *Dirt & Aggregate* where we held there was no explicit grant of authority by Congress for the states to regulate in federal parks. Contrast this with *Goodyear Atomic* where Congress explicitly granted the states authority to enforce their own workers' safety regulations in conjunction with the federal workers' compensation statutes.

Unlike the cases appellants rely on for support that states cannot interfere with a federal function, here, the Constitution explicitly confers broad authority on the states to dictate the manner and mode of appointing presidential electors. Indeed, *Ray* undermines the position of appellants because, as noted, the Court there upheld the state's pledge requirement as constitutional. While appellants argue that *Ray* is limited to the primary election, the Court's holding clearly demonstrates the broad grant of authority to the states under article II, section 1. *Burroughs* and *McPherson* also reinforce the principle that the manner of appointment is exclusive to the states. As the Court in *In re Green* explained, the role of the elector is to "transmit the vote of the State for President," suggesting that the Electoral College vote belongs to the State, not the individual elector. 134 U.S. at 379.

Finally, nothing in article II, section 1 suggests that electors have discretion to cast their votes without limitation or restriction by the state legislature. To the extent that the federal functions of the electors are mentioned in the Constitution, they are found in the

17

Twelfth Amendment. The Twelfth Amendment simply requires the electors to meet at the specified date and time outlined by Congress and to cast two votes for qualified candidates—one for president and one for vice-president. The Constitution does not limit a state's authority in adding requirements to presidential electors, indeed, it gives to the states absolute authority in the manner of appointing electors. Thus, it is within a state's authority under article II, section 1 to impose a fine on electors for failing to uphold their pledge, and that fine does not interfere with any federal function outlined in the Twelfth Amendment.

Elector Discretion

Auxiliary to the federal function argument above, appellants argue that electors were intended to exercise discretion when casting votes in the Electoral College.[7] "[I]t was supposed that the electors would exercise a reasonable independence and fair judgment in the selection of the Chief Executive." *McPherson*, 146 U.S. at 36. Appellants cite to a few cases as persuasive. *See Op. of Justices*, 250 Ala. 399, 400, 34 So. 2d 598 (1948) (proposed amendment to statute that required electors to "cast their ballots for the nominee of the national convention of the party by which they were elected" was likely unconstitutional); *Breidenthal v. Edwards*, 57 Kan. 332, 46 P. 469 (1896) (candidate has no right to dictate how his name is to be placed on the electoral ticket); Order of U.S. Court of Appeals, *Baca v. Hickenlooper*, No. 16-1482, 2016 U.S.

---

[7] Appellants argue Hamilton's *Federalist Papers* supports the framers intended the electors to exercise discretion as they would have the "'information and discernment' necessary to choose a wise President." Br. of Appellants at 16 (quoting THE FEDERALIST NO. 68 (Alexander Hamilton)); *see supra* p. 6.

18

App. LEXIS 23391 (10th Cir. Dec. 16, 2016) (denying motion for injunction because plaintiffs failed to show they had a likelihood of successfully appealing). These cases, appellants argue, support their position that state legislatures are without authority to "'restrict the right [to vote] of a duly elected elector.'" Br. of Appellants at 19-20 (alteration in original) (quoting *Op. of Justices*, 250 Ala. at 401).

We find these cases inapt. The *Opinion of Justices* was an advisory opinion that speculated on the constitutionality of a proposed amendment before it was enacted. More importantly, it was published prior to *Ray*, which overturned that court's decision, in part, based on similar rationale to *Opinion of Justices*. As to *Breidenthal*, appellants rely on one sentence that was not dispositive. In *Baca*, the plaintiffs filed for a preliminary injunction to prevent the secretary of state from removing them as presidential electors. But the court denied their motion, holding they failed to show there was a likelihood the plaintiffs would succeed on the merits. Appellants urge that *Baca* is instructive where the court, in dictum, noted the State of Colorado would be unlikely to remove a presidential elector after voting had begun both because the Colorado statute provided only for filling vacancies prior to the start of voting and "'in light of the text of the Twelfth Amendment.'" Br. of Appellants at 20 (quoting *Baca*, 2016 U.S. App. LEXIS 23391, at *16 n.4). We find other language in the court's opinion far more relevant. Significant here, the court pointed out that the electors had failed "to point to a single word in any [constitutional provision] that support their position that the Constitution requires that electors be allowed to exercise their discretion in choosing who to cast their votes for." Order at 10.

Appellants also argue a fine impermissibly adds new requirements that do not appear in the Constitution. They argue the only requirements to be nominated as an elector are that they cannot be a senator, representative, or other person holding an office of profit or trust; they must vote for at least one person who is not an inhabitant of the same state with themselves; and the person must be eligible for the office of president. *See* Br. of Appellants at 21-22. Appellants cite two cases that they argue support their contention. In *U.S. Term Limits, Inc. v. Thornton*, the issue was a state's proposed amendment that would prevent eligible candidates from appearing on the ballot if they have served more than three terms as a representative or two terms as a senator. 514 U.S. 779, 783, 115 S. Ct. 1842, 131 L. Ed. 2d 881 (1995) (term limits for federal officers). The Court there rejected the proposed amendment, holding that the states lack power to add qualifications. *Id.* at 805. In *Powell v. McCormack*, the Court held that Congress did not have the authority to exclude members-elect after they were duly elected by the people. 395 U.S. 486, 547-48, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969). These cases offer little support for appellants' position. *U.S. Term Limits* rests on explicit language in article I, section 2 that is not present here, and *Powell* is a limit on congressional, not state, authority. We acknowledge that some framers had intended the Electoral College electors to exercise independent judgment, but the Court in *Ray* reflects the historic reality. As the Court noted, "The suggestion that in the early elections candidates for electors . . . would have hesitated, because of constitutional limitations, to pledge themselves to support party nominees in the event of their selection as electors is impossible to accept." *Ray*, 343 U.S. at 228. While "[i]t is true that the Amendment says

20

the electors shall vote by ballot," "it is also true that the Amendment does not prohibit an elector's announcing his choice beforehand, pledging himself." *Id.* Even if read as narrowly as appellants urge, *Ray*'s holding rests on a rejection of appellants' position that the Twelfth Amendment demands absolute freedom for presidential electors.[8]

We believe that *Ray* disposes of this question.[9] The Twelfth Amendment does not demand absolute freedom of choice for electors. In the same way that the Twelfth

---

[8] We also note that appellants and amici argue elector discretion is required by the language of the Constitution. They argue the phrase "by Ballot" means a "personal, secret ballot." Br. of Appellants at 16; *see also* Br. for Amicus Curiae Independence Inst. at 3-5. While it is plausible that the framers meant for the electors to cast their ballots "in secret," it is equally plausible the framers used the word "ballot" to describe a device used to record the electors' votes. *See* BLACK'S LAW DICTIONARY 171 (10th ed. 2014) ("An instrument . . . used for casting a vote.") Indeed, the names of every presidential elector is on a state's certificate of ascertainment submitted to Congress. *See* 3 U.S.C. § 5. Moreover, we know how Washington State's presidential electors individually voted for president and vice-president in the 2016 election. *See* Natalie Brand, *Washington State Electors Vote for Clinton, Powell, Faith Spotted Eagle*, KING5 NEWS (Dec. 20, 2016, 6:22 AM), https://www.king5.com/article/news/politics/washington-state-electors-vote-for-clinton-powell-faith-spotted-eagle/281-373558515; Liza Javier, *PresidentialBallots*, KING5 NEWS, https://www.documentcloud.org/documents/3243191-PresidentBallots.html; Liza Javier, *VicePresidentBallots*, KING5 NEWS, https://www.documentcloud.org/documents/3243190-VicePresidentBallots.html.
     A number of "faithless electors" have surfaced in prior elections. *See, e.g.*, Subcomm. on Constitutional Amendments of Comm. on the Judiciary, 87th CONG., *The Electoral College, Operation and Effect of Proposed Amendments to the Constitution of the United States* 9 (Comm. Print 1961) (Henry D. Irwin of Oklahoma defected and voted for Senator Harry F. Byrd instead of Richard Nixon); Note, *State Power To Bind Presidential Electors*, 65 COLUM. L. REV. 696 (1965). We know of "faithless electors" also appearing in our nation's early elections. *See* Note, *supra*, at 701 nn.40-41 (In 1796, Federalist Elector Samuel Miles voted for the antifederalist candidates, Jefferson and Pinckney. In 1820, New Hampshire elector William Plumer voted for John Quincy Adams instead of James Monroe.). The fact that "faithless electors" have been identified throughout our nation's history suggests "ballot" simply means "to record a vote," rather than to vote in secret.

[9] Appellants say that *Ray* is not controlling here because the Court did not address enforceability of the pledge requirement. They argue there is a distinction between moral authority and legal enforceability. *See* Reply Br. of Appellants at 15-16. But *Ray* does make clear that the State may impose obligations such as a pledge and thus rejects unfettered elector discretion.

21

Amendment does not prevent an elector from pledging himself, it does not prevent a state from requiring its electors pledge to vote for its party candidate.

First Amendment

Finally, appellants argue that imposing a fine violates their First Amendment right to vote. In support, appellants argue that voting is an expressive act and is protected from any viewpoint-based restrictive state action. Br. of Appellants at 28. Appellants argue their votes are a personal choice and the State must honor that choice. *See id.* at 29-30.

Appellants rely on *Miller v. Town of Hull*, 878 F.2d 523 (1st Cir. 1989). In that case, a municipal governing board removed members of a public agency for failing to vote in a way the members of the board preferred. *Id.* at 527. The court held removal was unconstitutional because "the act of voting on public issues by a member of a public agency or board comes within the freedom of speech guarantee of the first amendment. This is especially true when the agency members are elected officials." *Id.* at 532. "The entire course of conduct by the defendants supports the conclusion that the plaintiffs were suspended because of the position they took as . . . members with respect to the housing project . . . . This was a violation of their first amendment rights." *Id.* at 533.

The State, on the other hand, relies on *Nevada Commission on Ethics v. Carrigan*, arguing that the case supports the imposition of the fine here. 564 U.S. 117, 119, 131 S. Ct. 2343, 180 L. Ed. 2d 150 (2011). There, the appellee was under investigation for violating the State's recusal rules by voting to approve an application for a development project that his longtime friend and campaign manager worked on. *Id.* at 120. The commission had concluded that he had a conflict of interest, and the appellee appealed,

22

arguing the law was unconstitutional under the First Amendment. *Id.* at 120-21. The Supreme Court reversed the Nevada Supreme Court's holding that the recusal rules violate the First Amendment. In doing so, the Court held that "a legislator's vote is the commitment of his apportioned share of the legislature's power to the passage or defeat of a particular proposal. The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Id.* at 125-26.

*Nevada Commission* is analogous here because electors act by authority of the State. *See Ray*, 343 U.S. at 224-25. It is the "sole function of the presidential electors . . . to cast, certify and transmit the vote of the State for President and Vice President of the nation." *In re Green*, 134 U.S. at 379. In essence, the electors are carrying out a state government duty. *See Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) (speech made in the course of a government duty is not protected by the First Amendment). Indeed, we note the federal district court recently engaged in a similar analysis of an elector's First Amendment rights. *See Chiafalo v. Inslee*, 224 F. Supp. 3d 1140, 1145 (W.D. Wash. 2016).[10] There, the court rejected the plaintiff's First Amendment argument on similar grounds, recognizing that the "[r]elevant legal authority characterizes electors' role as 'ministerial' [and] limits the context in which the First Amendment protects individuals performing their official, governmental duties." *Id.*

---

[10] Some of the appellants filed for preliminary injunction in federal court prior to the State assessing the fine complained of here. Judge James Robart denied their preliminary injunction, rejecting nearly identical arguments the appellants make before us.

(citation omitted) (discussing *Thomas v. Cohen*, 146 Misc. 836, 262 N.Y.S. 320, 326 (Sup. Ct. 1933), and *Garcetti*, 547 U.S. at 421-22).

The power of electors to vote comes from the State, and the elector has no personal right to that role. The "[appellants] chose to stand for nomination as an elector for their party, subject to the rules and limitations that attend the position. They also retain the ability to step down as electors without penalty." *Id.* (citations omitted). "[I]t is unlikely that casting electoral ballots implicates [appellants'] First Amendment rights." *Id.*

We hold the First Amendment is not implicated when an elector casts a vote on behalf of the State in the Electoral College.

CONCLUSION

Article II, section 1 of the United States Constitution grants to the states plenary power to direct the manner and mode of appointment of electors to the Electoral College. We hold that the fine imposed pursuant to RCW 29A.56.340 falls within that authority. We further hold nothing under article II, section 1 or the Twelfth Amendment to the Constitution grants to the electors absolute discretion in casting their votes and the fine does not interfere with a federal function. Finally, an elector acts under the authority of the State, and no First Amendment right is violated when a state imposes a fine based on an elector's violation of his pledge. We affirm the trial court.

_Madsen, J._

WE CONCUR:

_Fairhurst, CJ._         _Wiggins, J._

No. 95347-3

GONZÁLEZ, J. (dissenting)—In 1976, Michael J. Padden, a Washington

elector, voted for Ronald Reagan even though the Republican Party nominated

Gerald Ford.[1] The following year, the legislature enacted a law requiring electors

to vote for the candidates nominated by their political party or face a civil penalty

of up to $1000. LAWS OF 1977, 1st Ex. Sess., ch. 238, §§ 1-2. In 2016, the electors

before us did not vote for the candidates nominated by their party. We must decide

if the State has the constitutional authority to impose a civil penalty on them. The

majority upholds imposition of the civil penalty. I respectfully dissent.

The State's authority to penalize its electors is an issue of first impression.

*Ray v. Blair* concerns only the broad authority to appoint electors. 343 U.S. 214,

227, 72 S. Ct. 654, 96 L. Ed. 894 (1952) ("It is an exercise of the state's right to

appoint electors in such manner, subject to possible constitutional limitations, as it

---

[1] Official Ballot for the Position of President (Dec. 13, 1976) (on file with Wash. State Archives, Electoral College and Federal Election Certifications, 1948-2012).

may choose." (citing U.S. CONST. art. II, § 1)). The Court addressed the constitutionality of requiring electors to make a pledge but did not address the elector's discretion. *Id*. at 228. In dissent, Justice Robert H. Jackson raised concerns about an elector's freedom to exercise independent judgment as originally intended. I share his concerns. He opined, "No one faithful to our history can deny that the plan originally contemplated, what is implicit in its text, that electors would be free agents, to exercise an independent and nonpartisan judgment as to the [individuals] best qualified for the Nation's highest offices." *Id*. at 232 (Jackson, J., dissenting) (citing THE FEDERALIST NO. 68 (Alexander Hamilton)).

There is a meaningful difference between the power to appoint and the power to control. "A power not expressly listed [in the Constitution] is granted only if incidental to an enumerated power." Br. for Amicus Curiae Independence Inst. at 8 (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405, 4 L. Ed. 579 (1819)). The Constitution provides the State only with the power to appoint, leaving the electors with the discretion to vote their conscience. *See* U.S. CONST. art. II, § 1. Therefore, the State cannot impose a civil penalty on electors who do not vote for the candidates nominated by their party. I respectfully dissent.

González, J.